IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MSM DESIGN AND ENGINEERING LLC,

    Plaintiff,

v.

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

    Defendants.

Civil Action No.: 1:20-cv-00121

# COMPLAINT

Plaintiff, MSM Design and Engineering LLC ("MSM" or "Plaintiff") hereby files this Complaint against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and for its Complaint hereby alleges as follows:

## JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq. 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331. This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive commercial Internet stores operating under the Defendant domain names and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant

Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet Stores through which Illinois residents can purchase products bearing counterfeit versions of Plaintiff's trademark. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing counterfeit versions of Plaintiff's federally registered trademark to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

**INTRODUCTION**

3. This action has been filed by Plaintiff to combat online counterfeiters who trade upon Plaintiff's reputation and goodwill by selling and/or offering for sale products in connection with Plaintiff's TORQBAR trademark, which is covered by U.S. Trademark Registration No. 5,104,961 (The "TORQBAR trademark"). The registration is valid, subsisting, unrevoked, uncancelled, and incontestable pursuant to 15 U.S.C. § 1065. The registration for the trademark constitutes prima facie evidence of validity and of Plaintiff's exclusive right to use the trademark pursuant to 15 U.S.C. § 1057(b). A true and correct copy of the U.S. federal trademark registration certificate for the TORQBAR trademark is attached as Exhibit 1.

4. The Defendants operate as a ring of counterfeiters operating on e-commerce sites such as Amazon, eBay and, Alibaba. E-commerce giant Alibaba has even formed a special task force to root out illegal counterfeiting rings. According to Alibaba, telltale indications of a counterfeiting ring and its affiliated manufacturing source in action are the use of fictitious identities that are adopted to provide the counterfeiting ring with the ability to play whack-a-mole with authorities

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20 

BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm

5. Plaintiff's investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, the online storefront names set forth in Schedule A employ no normal business nomenclature and, instead, have the appearance of being made up. Thus, the Defendant Internet Stores are using fake online storefronts designed to appear to be selling genuine Plaintiff products, while selling inferior imitations of Plaintiff's products. The Defendant Internet Stores also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting

that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of Plaintiff's registered trademark, as well as to protect unknowing consumers from purchasing unauthorized TORQBAR products over the Internet. Lastly, Plaintiff's investigation has discovered that one of the named defendants in the present action is a factory that produces thousands of products a month and is a source of the counterfeit TORQBAR products:



6. This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this Judicial District, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this

Judicial District. In addition, each defendant has offered to sell and ship infringing products into this Judicial District.

## THE PLAINTIFF

7. Plaintiff, MSM Design and Engineering LLC, is a Washington Limited Liability Company that maintains its principal place of business at 17775 Suquamish Way NE, Suquamish, Washington 98392. Plaintiff is engaged in the business of manufacturing, distributing and retailing handheld spinning device products such as the TORQBAR, a spinning handheld toy you flick with your fingers, including within the Northern District of Illinois District (collectively, the "Plaintiff Products") under the Federally registered trademark TORQBAR. Defendants' sales of Counterfeit Products in violation of Plaintiff's trademark rights are irreparably damaging Plaintiff.

8. Plaintiff's brand, symbolized by the TORQBAR trademark, is a recognized symbol of high-quality products. Since their inception in Plaintiff's garage in 2015, TORQBAR products have been heavily in demand. So much so that during their first presale in 2016, the company's website crashed five times in its first 45 minutes while also managing to sell over 1,000 units.

9. The path of TORQBAR has been anything but linear. Every time Plaintiff tried to change the shape of their product, they encountered hurdles. Specifically, Plaintiff's Luna TORQBARs resulted from a machine shop error that produced five-hundred non-functional TORQBARS. After thinking about what to do for a wile, Plaintiff employed some entrepreneurial creativity to re-cut the products into a functional design, which led to the success of the Luna line.

10. Unlike the counterfeit options that can be found online, genuine TORQBAR products are made of expensive metals and have high-quality components. TORQBAR brand products are the premium product in their class according to Forbes:

**Forbes**  Billionaires   Innovation   Leadership   Money   Business   Small Business   Lifest

## The $199 Torqbar Is The iPhone Of Desk Toys

 James Plafke  Former Staff
Tech

⏱ This article is more than 2 years old.

*If you're in the market for something to curb your nail-biting or need an innocuous outlet for your nervous or bored energy, fidget spinners might just be the answer. After extensive testing -- and despite a couple flaws -- we all, at the very least, really like them and take them with us wherever we go, but which fidget spinner is for you?*



The titanium, brass, copper, stainless steel Torqbar, two key chain attachments, and a single bar's... [+]

Out of the handful of high-end spinners, MD Engineering's Torqbar could be billed as the flagship fidget spinner much in the way Apple's iPhone is often considered the premier smartphone. Like the iPhone, its superb build quality and "it just works" usability create a niche craze. Its currently limited availability only strengthens its Apple-cult-like following. The community around the Torqbar -- from Facebook groups and YouTube reviews to forums about everyday carry items -- is small, but extremely passionate. Due to its limited availability and passionate community, the Torqbar's going price on eBay is kind of insane (we've seen numbers crest $400 for a single spinner, over twice their retail price), and is reminiscent of the niche, I-can't-believe-someone-would-pay-so-much-for-*that* market for

https://www.forbes.com/sites/jplafke/2016/12/23/the-199-torqbar-is-the-iphone-of-desk-toys/#7bbe6ab67134

while the products sold by defendants are nothing more than cheap imitations that sell for substantially less and are often made of cheap metal that has been spray painted to appear like the original's brass, copper, stainless steel, or titanium:



11. The TORQBAR trademark is distinctive and identifies the merchandise as goods from Plaintiff. The registration for the TORQBAR trademark constitutes prima facie evidence of the validity and of Plaintiff's exclusive right to use the trademark pursuant to 15 U.S.C. § 1057(b).

12. The TORQBAR trademark has been continuously used and never abandoned.

13. Plaintiff has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the TORQBAR trademark. As a result, products bearing the TORQBAR trademark are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from Plaintiff.

## THE DEFENDANTS

14. Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit TORQBAR products to consumers within the United States, including Illinois and in this Judicial District.

## THE DEFENDANTS' UNLAWFUL CONDUCT

15. The success of the TORQBAR brand has resulted in its counterfeiting and infringement. Plaintiff has identified numerous marketplace listings on platforms such as Amazon, eBay, Wish, Alibaba, Ali Express, including the Defendant Internet Stores ("Infringing Websites" or "Infringing Webstores"), which were offering for sale, selling, and importing counterfeit and infringing TORQBAR products to consumers in this Judicial District and throughout the United States. Internet websites like the Defendant Internet Stores are estimated to receive tens of millions of visits per year and to generate over $135 billion in annual online sales. According to an intellectual property rights seizures statistics report issued by Homeland Security, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in fiscal year 2013 was over $1.74 billion, up from $1.26 billion in 2012. Internet websites like the Defendant Internet Stores are also estimated to contribute to tens of thousands of lost jobs for legitimate businesses and broader economic damages such as lost tax revenue every year.

16. Upon information and belief, Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine TORQBAR products. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union and PayPal. Defendant Internet Stores often include images and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos. Plaintiff has not licensed or authorized Defendants to use its TORQBAR trademark, and none of the Defendants are authorized retailers of genuine TORQBAR products.

17. Upon information and belief, Defendants also deceive unknowing consumers by using the TORQBAR trademark without authorization within the content, text, and/or meta tags of their websites to attract various search engines crawling the Internet looking for websites relevant to consumer searches for TORQBAR products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine TORQBAR products. Further, Defendants utilize similar illegitimate SEO tactics to propel new domain names to the top of search results after others are shut down. As such, Plaintiff also seeks to disable Defendant Domain Names owned by Defendants that are the means by which the Defendants could continue to sell counterfeit and/or infringing TORQBAR products.

18. Defendants often go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. For example, to avoid detection, Defendants register Defendant Domain Names using names and physical addresses that are incomplete, contain randomly typed letters, or fail to include cities or states. Other Defendant Domain Names often use privacy services that conceal the owners' identity and contact information. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants toconceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

19. There are also similarities among the Defendant Internet Stores. For example, some of the Defendant websites have virtually identical layouts. In addition, the counterfeit and/or infringing TORQBAR products for sale in the Defendant Internet Stores bear similarities and indicia of being related to one another, suggesting that the counterfeit and/or infringing TORQBAR products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, metadata, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

20. Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once tey receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring takedown demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2012 U.S. Customs and Border Protection report on seizure statistics indicated that the Internet has fueled "explosive growth" in the number of small packages of counterfeit and infringing goods shipped through the mail and express carriers.

21. Further, counterfeiters such as Defendants typically operate multiple credit card merchant accounts and third party accounts, such as PayPal, Inc. ("PayPal") accounts, behind layers of payment gateways so that they can continue operating in spite of Plaintiff's enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court..

22. Defendants, without any authorization or license from Plaintiff, have knowingly and willfully used and continue to use the TORQBAR trademark in connection with the advertisement, distribution, offering for sale, and sale of counterfeit TORQBAR products into the United States and

Illinois over the Internet. Each Defendant Internet Store offers shipping to the United States, including Illinois, and, on information and belief, each Defendant has offered to sell counterfeit and infringing TORQBAR products into the United States, including Illinois. Some examples are as follows:



23. Defendants' use of the TORQBAR trademark in connection with the advertising, distribution, offering for sale, and sale of counterfeit TORQBAR products, including the sale of counterfeit and infringing TORQBAR products into Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers, and is irreparably harming Plaintiff.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

24. Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

25. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the registered TORQBAR trademark in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The TORQBAR trademark is a highly distinctive mark. Consumers have come to expect the highest quality from Plaintiff's products provided under the TORQBAR trademark.

26. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the TORQBAR trademark without Plaintiff's permission.

27. Plaintiff is the exclusive owner of the TORQBAR trademark. Plaintiff's United States Registration for the TORQBAR trademark (Exhibit 1) is in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiff's rights in the TORQBAR trademark, and are willfully infringing and intentionally using counterfeits of the TORQBAR trademark. Defendants' willful, intentional and unauthorized use of the TORQBAR trademark is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general public.

28. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

29. Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its well-known TORQBAR trademark.

30. The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit TORQBAR products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

31. Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

32. Defendants' promotion, marketing, offering for sale, and sale of counterfeit TORQBAR products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' counterfeit TORQBAR products by Plaintiff.

33. By using the TORQBAR trademark in connection with the sale of counterfeit TORQBAR products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit TORQBAR products.

34. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit TORQBAR products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

35. Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

## COUNT III
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
## (815 ILCS § 510, *et seq.*)

36. 38. Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

37. Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their counterfeit TORQBAR products as those of Plaintiff, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of

confusion and/or misunderstanding as to an affiliation, connection, or association with genuine TORQBAR products, representing that their products have Plaintiff's approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

38. The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

39. Plaintiff has no adequate remedy at law, and Defendants' conduct has caused Plaintiff to suffer damage to its reputation and goodwill. Unless enjoined by the Court, Plaintiff will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## COUNT V
## CIVIL CONSPIRACY

40. Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

41. Plaintiff is informed and believes and thereon alleges that Defendants knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation engaging in collaborated efforts to the distribution, marketing, advertising, shipping, offering for sale, or sale of fake TORQBAR Products, in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

42. The intent, purpose, and objective of the conspiracy and the underlying combination of unlawful acts and misconduct committed by the Defendants was to undermine MSM and its business by unfairly competing against it as described above.

43. The Defendnats each understood and accepted the foregoing scheme and agreed to do their respective part, to further accomplish the foregoing intent, purpose and objective. Thus,

by entering into the conspiracy, each Defendant has deliberately, willfully, and maliciously permitted, encouraged, and/or induced all of the forefoing unlawful acts and misconduct.

44. As a direct and proximate result of the unlawful acts and misconduct undertaken y each Defendant in furtherance of the conspiracy, MSM has sustained, and unless each Defendant is restrained and enjoined, will continue to sustain severe, immediate, and irreparable harm, damage, and injury for which MSM has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily preliminarily, and permanently enjoined and restrained from:

   a. using the TORQBAR trademark or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine TORQBAR product or is not authorized by Plaintiff to be sold in connection with the TORQBAR trademark;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine TORQBAR product or any other product produced by Plaintiff that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the TORQBAR trademark;

   c. committing any acts calculated to cause consumers to believe that Defendants' counterfeit TORQBAR products are those sold under the authorization, control, or

        supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d. further infringing the TORQBAR trademark and damaging Plaintiff's goodwill;

e. otherwise competing unfairly with Plaintiff in any manner;

f. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any Plaintiff trademark, including the TORQBAR trademark, or any reproductions, counterfeit copies, or colorable imitations thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the online marketplace accounts, the Defendant domain names, or any other domain name or online marketplace account that is being used to sell or is the means by which Defendants could continue to sell counterfeit TORQBAR products; and

h. operating and/or hosting websites at the Defendant domain names and any other domain names registered or operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing the TORQBAR trademark or any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine TORQBAR product or not authorized by Plaintiff to be sold in connection with the TORQBAR trademark; and

2) That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiff a written report under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through h, above;

3) Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as, but not limited to, Amazon and Alibaba Group Holding Ltd., Alipay.com Co., Ltd. and any related Alibaba entities (collectively, "Alibaba"), social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant domain names, and domain name registrars, shall:

    a. disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit TORQBAR products using the TORQBAR trademark, including any accounts associated with the Defendants listed on Schedule A;

    b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit TORQBAR products using the TORQBAR trademark; and

    c. take all steps necessary to prevent links to the Defendant domain names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant domain names from any search index; and

4) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the TORQBAR trademark be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that Plaintiff be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the TORQBAR trademark;

6) That Plaintiff be awarded its reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.

DATED: January 7, 2020  Respectfully submitted,

*/s/ Keith A. Vogt*
Keith A. Vogt (Bar No. 6207971)
Keith Vogt, Ltd.
111 West Jackson Boulevard, Suite 1700
Chicago, Illinois 60604
Telephone: 312-675-6079
E-mail: keith@vogtip.com

***ATTORNEY FOR PLAINTIFF***